UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ENTERPRISES INTERNATIONAL,
INC., et al.,

                    Plaintiffs,

        v.

INTERNATIONAL KNIFE & SAW,
INC., et al.,

                    Defendants.

CASE NO. C12-5638 BHS

ORDER GRANTING &
DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

    This matter comes before the Court on the motion for summary judgment (Dkt.

123) of Defendants International Knife and Saw, a South Carolina corporation ("IKS-

SC"), International Knife and Saw, Inc., a Quebec corporation ("IKS-Quebec"), and

International Knife and Saw De Mexico, S.A. DE C.V., a Mexican variable capital

corporation ("IKS-Mexico") (collectively, "Defendants"), seeking dismissal of all claims

by Enterprises International, Inc. ("Enterprises"), Legacy Automation, Inc. ("Legacy"),

and Ovalstrapping International ("Ovalstrapping") (collectively, "Plaintiffs").  The Court

has considered the pleadings filed in support of and in opposition to the motion and the

remainder of the file and hereby grants and denies in part the motion for the reasons

stated herein.

# I. PROCEDURAL HISTORY

On July 18, 2012, Plaintiffs Enterprises and Legacy, a wholly-owned subsidiary of Enterprises, both Washington corporations, filed a complaint alleging multiple causes of action against IKS-SC related to misuse of technical drawings for knife blades ("Lamb drawings"). Dkt. 1. On May 23, 2013, IKS-SC filed a motion for summary judgment seeking dismissal as a matter of law for all claims alleged against it. Dkt. 18. On June 10, 2013, Plaintiffs filed a response in opposition to IKS-SC's motion for summary judgment. Dkt. 25. On June 14, 2013, IKS-SC filed a reply. Dkt. 32.

On July 29, 2013, Plaintiffs filed an amended complaint adding additional parties and claims. Dkt. 70. Plaintiff Ovalstrapping, a wholly-owned subsidiary of Enterprises, was joined. *Id.* at 1-2. Additionally, Plaintiffs named IKS-Quebec, and IKS-Mexico as Defendants. *Id*. at 1-3. The latter two Defendants are owned by IKS-SC. Dkt. 72 at 3 (Amended Answer).

Plaintiffs' amended complaint alleges eight causes of action and seeks monetary damages, an order of replevin, injunctive relief, as well as attorney's fees, costs and expenses. *See* Dkt. 70 at 14-15. Plaintiffs' causes of action are: (1) breach of contract; (2) breach of implied contract in fact: quantum meruit; (3) breach of contract implied in law: unjust enrichment; (4) misappropriation of trade secrets pursuant to RCW 19.108, *et seq*.; (5) conversion; (6) unfair competition pursuant to RCW 19.86, *et seq*.; (7) replevin; and (8) copyright infringement pursuant to 17 U.S.C. § 106. *Id.* at 8-14.

On November 26, 2013, the Court issued an order granting in part and denying in part Defendants' summary judgment motion. Dkt. 86. Specifically, the Court granted

1  summary judgment finding Plaintiffs' claims for conversion, replevin, and unfair

2  competition pursuant to RCW 19.86 pre-empted under the Uniform Trade Secrets Act

3  ("UTSA"), RCW 19.108, *et seq.  See* Dkt. 86 at 21.  Plaintiffs' contract, trade secret

4  misappropriation and copyright infringement claims remain.

5      On December 26, 2013, Plaintiffs filed a motion for partial summary judgment

6  based on copyright infringement of three Lamb drawings (18D22B, 18D47R and

7  18D48R) and seeking injunctive relief.  Dkt. 104.  On January 13, 2014, Defendants

8  responded in opposition to Plaintiffs' motion.  Dkt. 115.  On January 17, 2014, Plaintiffs

9  filed a reply. Dkt. 118.

10     On January 29, 2014, Defendants filed the instant motion for summary judgment

11  dismissal of all Plaintiffs' remaining claims.  Dkt. 123.  On February 18, 2014, Plaintiffs

12  replied in opposition to Defendants' motion.  Dkt. 129.  On February 21, 2014,

13  Defendants filed a reply.  Dkt. 137.

14     On April 7, 2014, the Court issued an order denying Plaintiffs' motion for partial

15  summary judgment regarding copyright infringement of the three Lamb drawings

16  mentioned above. Dkt. 146.

17                          **II. BACKGROUND**

18     Plaintiff Enterprises is a holding corporation. Dkt. 26 (Declaration of David Lamb

19  ¶ 6). Over several decades it has owned different companies which design, manufacture,

20  and sell products under the brand name "Lamb" in the pulp and paper industry. *Id.* ¶¶ 1-

21  26. Enterprises maintains that its practice has long been to hold title to all intellectual

22  property, including design and engineering drawings, created by the Lamb family of

companies and their employees. Dkts. 26 (Lamb Decl.  ¶¶ 9-10) and Dkt. 27 (Declaration of C. James Frush, Exs. 1, 12).  Enterprises licenses its wholly-owned intellectual property to its subsidiaries. *Id.* and Dkt. 27 (Frush Decl. Exs. 3, 13).

Haines & Emerson, Inc. was one of Enterprises' subsidiaries. Dkts. 26 (Lamb Decl. ¶¶ 7-15) and 27 (Frush Decl. Ex. 2). Haines & Emerson owned Lamb Grays Harbor Co. ("LGH").  *Id.* Enterprises licensed certain intellectual property to Haines & Emerson and LGH, including design drawings for the knives used in Lamb cutter layboys. *Id.* and Dkt. 27 (Frush Decl., Ex. 3). LGH sold the Lamb cutter layboy knives, until 2001. Dkt. 26 (Lamb Decl. ¶ 26).

From the late 1980's though the early 200's, LGH hired International Knife and Saw ("IKS"), Defendants' alleged predecessor entity, to fabricate knives. Dkt. 27 (Frush Decl., Ex. 4). LGH provided IKS with the necessary design drawings for the knives. Dkts. 26 (Lamb Decl. ¶ 21) and 27 (Frush Decl., Ex. 4 at EII 342 (referring to "drawings in your (IKS's) possession")). LGH accumulated a trade debt to the prior IKS entity.  On September 24, 2001, Enterprises terminated Haines & Emerson's and LGH's license to the design drawings for the cutter layboy knives. Dkts. 26 (Lamb Decl. ¶ 15) and 27 (Frush Decl. Ex. 9). On September 24, 2001, Enterprises also incorporated a new wholly-owned subsidiary, Legacy, which eventually took over the remaining business of LGH. Dkts. 26 (Lamb Decl. ¶¶ 18, 19, 26) and 27 (Frush Decl., Ex. 10).

On or about September 28, 2001, US Bank foreclosed on and acquired all of LGH's assets.  Dkts. 26 (Lamb Decl. ¶ 16) and 27 (Frush Decl., Ex. 11).  U.S Bank then sold those assets to Ovalstrapping Acquisition Corporation, a wholly-owned subsidiary of

1   Ovalstrapping, which is a wholly-owned subsidiary of Enterprises.  Dkts. 27 (Lamb Decl.

2   ¶ 17) and 27 (Frush Decl., Exs. 11 and 12).  On September 28, 2001, Enterprises and

3   Ovalstrapping Acquisition Corporation entered into an assignment agreement transferring

4   all intellectual property acquired in the purchase of LGH's assets to Enterprises.  Dkts. 26

5   (Lamb Decl. ¶17) and 27 (Frush Decl., Ex. 12).  Enterprises became the successor in

6   interest to LGH's rights under its contracts with IKS.  Dkt. 25 at 10.  On October 1, 2003,

7   Enterprises licensed to Legacy the use of the Lamb design drawings.  Dkts. 26 (Lamb

8   Decl. ¶ 19) and 27 (Frush Decl., Ex. 13).

9        On September 24, 2001, IKS, a Delaware Corporation, filed for Chapter 11

10  reorganization.  Dkt. 19-1 at 31 (IKS Bankruptcy Docket).  On December 17, 2001, the

11  bankruptcy court issued an order confirming Second Amended Joint Plan of

12  Reorganization.  *Id*. at 45.

13       In April through June 2003, during IKS's Chapter 11 reorganization process,

14  Legacy bought knives from IKS based on the Lamb drawings.  Dkts. 27 (Frush Decl., Ex.

15  14) and 33-1 (Swanson Suppl. Decl, Ex. G) (purchase orders with no terms and

16  conditions attached).  On June 17, 2003, the final decree closing IKS's chapter 11

17  bankruptcy was issued. Dkt. 19-1 at 54.  IKS's bankruptcy case was closed on July 31,

18  2003.  *Id*. It is undisputed that Plaintiffs never sought the return of Lamb drawings from

19  IKS.  On October 31, 2003, the reorganized IKS merges with Simonds Industries Inc.,

20  and the company became Simonds International ("Simonds"), which still exists today.

21  Dkt. 19-3 at 49.

22

1    On January 8, 2004, LGH filed a Chapter 7 bankruptcy petition, and its

2  proceedings terminated in July 2005 with no asset distribution. Dkt. 19-1 at 7.

3    In 2005 and 2006, Ovalstrapping and Simonds enter into purchase order

4  agreements for products based on Lamb drawings. Dkt. 32 at 8-9 (*citing* Dkt. 33-1

5  Swanson Suppl. Dec. ¶ 12 and Ex. J).

6    In June of 2006, International Knife and Saw/American Custom Metals, Inc., a

7  South Carolina corporation ("IKS/ACM"), Simonds, and IKS entered into an asset

8  aquisition agreement, which IKS-SC asserts formed IKS/ACM.  Dkt. 32 at 9 (*citing* Dkt.

9  19-3 at 54-111).  On July 31 and December 14, 2007, Ovalstrapping and IKS/ACM

10 entered into a non-disclosure agreement and a purchase order, respectively, regarding a

11 product per a certain Lamb drawing.  Dkt. 32 at 9 (*citing* Dkts. 27-6 (Frush Decl., Ex. 17)

12 and 33 at 3 (Swanson Suppl. Decl., Ex. J)).

13    In January 2008, according to IKS-SC, a security purchase agreement was entered

14 into by multiple entities resulting in "the current IKS-SC's formation." Dkt. 32 at 9

15 (*citing* Swanson Decl., Ex. K (filed under seal)).

16                              **III. DISCUSSION**

17 **A.    Summary Judgment Standard**

18     Summary judgment is proper only if the pleadings, the discovery and disclosure

19 materials on file, and any affidavits show that there is no genuine issue as to any material

20 fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

21 The moving party is entitled to judgment as a matter of law when the nonmoving party

22 fails to make a sufficient showing on an essential element of a claim in the case on which

1    the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

2    323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

3    could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

4    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

5    present specific, significant probative evidence, not simply "some metaphysical doubt").

6    *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

7    if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

8    jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

9    U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

10   626, 630 (9th Cir. 1987).

11         The determination of the existence of a material fact is often a close question. The

12   Court must consider the substantive evidentiary burden that the nonmoving party must

13   meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

14   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

15   issues of controversy in favor of the nonmoving party only when the facts specifically

16   attested by that party contradict facts specifically attested by the moving party.  The

17   nonmoving party may not merely state that it will discredit the moving party's evidence

18   at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

19   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

20   nonspecific statements in affidavits are not sufficient, and missing facts will not be

21   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

22

**B.      Copyright Claims**

    **1.      Standing**

In the Court's order on Plaintiffs' motion for partial summary judgment, it determined that Enterprises, but not its subsidiaries, has standing to sue for copyright infringement. *See* Dkt. 146 at 8. However, pursuant to a licensing agreement with Legacy, Enterprises also authorized Legacy to sue for infringement.  Dkt. 27-5 at 9. Plaintiffs did not cite this particular portion of the agreement to the Court.  Nonetheless, the Court has discovered this provision and now amends its finding: Enterprises and Legacy both have standing to sue for infringement.

    **2.      Scope of Copyright**

Defendants move for dismissal of all Enterprises's copyright infringement claims. Dkt. 123.  However, as Enterprises observes, and Defendants do not dispute, Defendants' brief only specifically addresses the three copyrighted Lamb drawings (18D22B, 18D47R and 18D48R) for which Enterprises sought partial summary judgment. *See* Dkt. 129 at 16.  Further, as Enterprises observes, some drawings still may not have been produced. *Id.* The latter is the subject of a recent Court order requiring the parties to meet and confer and outlining directives so that the parties may resolve an ongoing discovery dispute about whether or not Defendants are concealing Lamb drawings and associated sales records. Dkt. 159.

Based on the record before the Court, no genuine issue of material fact exists regarding whether Defendants infringed on the three Lamb drawings (18D22B, 18D47R and 18D48R) for which Enterprises sought partial summary judgment. Defendants argue

1   here, as they did in their brief opposing Plaintiffs' motion for partial summary judgment,

2   that the aforementioned Lamb drawings do not fall within the scope of copyright

3   protection. *See, e.g.,* Dkts. 123 at 27 and 146 at 9-13.  The Court concurs, consistent with

4   its prior order, that the copying of Lamb technical design drawings

5           which are used only for the fabrication of specific knives or knife blades,
            when the designs admittedly contain only functional and utilitarian
6           information, the sole purpose of which is to manufacture specific types of
            knives or blades to precisely fit certain machines, does not constitute a
7           violation of the [Copyright] Act.

8   Dkt. 146 at 12.  Therefore, the Court grants Defendants' summary judgment as to the

9   three Lamb drawings (18D22B, 18D47R and 18D48R) specifically addressed in their

10  motion.

11          **3.      Statute of Limitations on Remaining Copyright Claims**

12          "A cause of action for copyright infringement accrues when one has knowledge of

13  a violation or is chargeable with such knowledge." *Roley v. New World Pictures, Ltd.*, 19

14  F.3d 479, 481 (9th Cir. 1994).  "In copyright litigation, the statute of limitations issue that

15  often arises is that the plaintiff filed its copyright claim more than three years after it

16  discovered or should have discovered infringement." *Polar Bear Prods., Inc. v. Timex*

17  *Corp.*, 384 F.3d 700, 705–06 (9th Cir. 2004); 17 U.S.C. § 507(b).  The Copyright Act

18  "does not provide for a waiver of infringing acts within the limitation period if earlier

19  infringements were discovered and not sued upon, nor does it provide for any reach back

20  if an act of infringement occurs within the statutory period." *Roley*, 19 F.3d at 481

21  (quotation omitted).  However, "[i]n a case of continuing copyright infringements, an

22

1  action may be brought for all acts that accrued within the three years preceding the filing

2  of the suit." *Id.*

3       An internal Ovalstrapping email, dated February 3, 2003, directed to Camille

4  Wilson ("Wilson"), Ovalstrapping's 30(b)(6) deponent, summarizes Plaintiffs'

5  representatives' knowledge that the prior IKS entity was directly soliciting former LGH

6  customers to supply their needs for spare or replacement parts.  Dkt. 116-4 at 31

7  (Swanson Decl. Ex. R (Dep. Ex. 141)). Wilson could not recall the specifics of any

8  Ovalstrapping response to IKS's direct solicitation of customer concerns, and had no

9  information suggesting that IKS had stopped soliciting business from former LGH

10  customers after February 2003.  Dkt. 116-4 (Swanson Decl., Ex Q (Wilson Dep., 26: 24 -

11  -28: 14)).

12       Plaintiffs argue that the 2003 email is not evidence[1] that they were on notice that a

13  former IKS entity was copying their Lamb drawings (Dkt. 118 at 13). However, the

14  Court finds that it is indeed evidence sufficient to show that Plaintiffs could have easily

15  learned with reasonable diligence that their drawings were being used to fabricate Lamb

16  replacement parts for their customers, when they knew that IKS was in possession of

17  Lamb fabrication drawings based on prior business dealings.  Upon receipt of this email,

18  Plaintiffs were chargeable with the knowledge that IKS was infringing.  *Roley*, 19 F.3d

19  479.  As indicated in a Seventh Circuit case, a cause of action "accrues" based upon an

20

21      [1] Plaintiffs maintain that the email is hearsay and thus inadmissible. Dkt. 118 at 13.

22  However, they are incorrect, as the content of the 2003 email goes to Plaintiffs' state of mind and not offered for the truth of the matter asserted.

1  objective standard, when either the plaintiff "learned or by reasonable diligence could

2  have learned that they had a cause of action." *Taylor v. Meirck*, 712 F.2d 1112, 1117-

3  1118 (7th Cir. 1983).  The Ninth Circuit has adopted the Seventh Circuit's standard for

4  accrual. *See Polar Bear Prods., Inc.*, 384 F.3d 707 and n.4 (*citing Taylor*, 712 F.2d at

5  1117-1118 and *Roley*, 19 F.3d at 481) (explaining how *Roley* defined accrual adopting

6  knew or should have known standard from *Taylor*).

7       Therefore, with respect to the remaining copyright claims not disposed of by this

8  order, Enterprises's action for copyright infringement may only "be brought for all acts

9  that accrued within the three years preceding the filing of the suit," from July 18, 2009.

10 *Roley*, 19 F.3d at 481.

11      **4.      IKS Chapter 11 Bankruptcy Proceedings**

12      Defendants wage the same argument in the instant motion for summary judgment

13 as they did in their initial motion for summary judgment and their opposition to

14 Plaintiffs' motion for partial summary judgment, albeit with additional evidence to

15 support their prior arguments.  Dkts. 18, 115 and 123.  They argue that when IKS filed

16 for Chapter 11 bankruptcy, neither Enterprises nor LGH (still technically in existence

17 from 2001 to 2004) failed to file an adversary proceeding claim seeking the return of the

18 subject Lamb drawings, as required under the IKS reorganization plan, thereby barring

19 their present claims.   Dkt. 123 at 12, 29-30.  IKS-SC maintains that it

20      is well established that once confirmed, a debtor's reorganization plan binds
        the debtor and all creditors, regardless of whether the creditor has accepted
21      the plan. . . . [A]n order confirming a reorganization plan operates to
        discharge all unsecured debts  and  liabilities, even  of tort  victims  who
22      were  unaware  of  the  debtor's bankruptcy.

Dkt. 123 at 29 (incorporated by reference from Dkt. 115 at 28 (*citing DePippo v. Kmart Corp.*, 335 B.R. 290 (S.D.N.Y. 2005)).

In its order on Defendants' initial motion for summary judgment, the Court found in relevant part that

> because the Court has found that there is a genuine issue of material fact as to when Plaintiffs knew or should have known of IKS or its successor entities' alleged misuse of the drawings (*see supra*), it also finds that there is a genuine issue of material fact as to whether Plaintiffs were on notice of the alleged misuse and should have made claims during IKS's bankruptcy. Therefore, summary judgment on this ground is denied.

Dkt. 84 at 16.  Further discovery revealed the February 2003 internal Ovalstrapping email (*see supra*) evidencing that Plaintiffs were on notice of the alleged misuse of the Lamb drawings before the prior IKS entity's bankruptcy proceedings closed on July 31, 2003. Dkt. 115 at 16 and 19-1 at 54 (IKS Bankruptcy Docket). Additionally, the record reveals that after Ovalstrapping took over the spare knife and knife blade parts business from LGH, it learned that the former IKS entity had filed for bankruptcy protection. Dkt. 116-2 at 20 (30(b)(6) Dep of Wilson) (testifying that a letter was sent by IKS to LGH about the bankruptcy filing and that it became a subject of conversation at Ovalstrapping).

While Defendants appear to argue that Plaintiffs were on notice of their alleged misuse of the drawings in 2001 due to (1) IKS's direct solicitation of customers (*see, e.g.,* Dkt. 116-4 at 16-21, Solicitation Letters); (2) the fact that IKS contacted Ovalstrapping about doing business; and (3) that they did do business with Ovalstrapping in 2001 (*see id.* at 25-27, 30(b)(6) Dep. of Wilson), that is not sufficient evidence from which the Court can conclude that Ovalstrapping or Enterprises were on inquiry notice that IKS was

1    misusing their drawings in 2001.  Based on the record, it was not until the February 2003

2    internal Ovalstrapping email that Plaintiffs were on notice of misuse. *See supra.*

3         Although IKS Bankruptcy proceedings did not close until July 31, 2003, the order

4    confirming IKS's reorganization plan was issued on December 17, 2001.  Dkt. 19-1 at 45

5    (Bankruptcy Docket). According to Defendants' own argument, it is the "*order*

6    *confirming a reorganization plan* [that] operates to discharge all unsecured debts and

7    liabilities…."  Dkt. 123 at 29 incorporating by reference Dkt. 115 at 28 (*citing DePippo*

8    *v. Kmart Corp.*, 335 B.R. 290 (S.D.N.Y. 2005) (emphasis added)).  Because there is no

9    evidence that Plaintiffs were on notice of the alleged misuse of their drawings before the

10   order confirming the Second Amended Joint Plan of Reorganization issued, nothing in

11   the record supports the conclusion that Plaintiffs had reason to file an adversary claim

12   regarding misuse.  Summary judgment is denied on this basis.

13   **C.    Misappropriation of Trade Secrets**

14        RCW 19.108.060, the Uniform Trade Secrets Act ("USTA"), establishes the

15   statute of limitations for bringing suit for misappropriation. It reads:

16        An action for misappropriation must be brought within three years
        after the misappropriation is discovered or by the exercise of reasonable
17        diligence should have been discovered. For the purposes of this section, a
        continuing misappropriation constitutes a single claim.
18
19   RCW 19.108.060.  Under Ninth Circuit law, a trade secret misappropriation claim

20   accrues when the plaintiffs became aware of either the wrongful acquisition or use of the

21   fabrication drawings. *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 523-24 (9th Cir. 1990).

22

1    Defendants argue that Plaintiffs' misappropriation claims accrued in early 2003.

2 Dkt. 123 at 13.  In its analysis of the application of the statute of limitation for copyright

3 claims *(see supra)*, the Court found that the February 2003 internal Ovalstrapping email

4 put Plaintiffs on notice that their Lamb drawings were being misused.  With their

5 drawings in IKS's possession, Plaintiffs then discovered that IKS was directly soliciting

6 their customers for the production of spare or replacement parts for Lamb equipment.

7 *See supra.*  Under these circumstances, with reasonable diligence, for example, through a

8 rather minimal investigation, Plaintiffs could have discovered that their drawings were

9 being misused, and pursued the USTA claim they now allege.  Plaintiffs failed to exercise

10 the requisite diligence in 2003.

11    Plaintiffs' claims for misappropriation of trade secrets were barred by the

12 statute of limitations in 2006.  RCW 19.108.060.  Therefore, summary judgment is

13 granted as to the dismissal of Plaintiffs' claim for trade secret misappropriation.

14 **D.    Contract Claims**

15    Defendants argue that Plaintiffs have no ability to enforce contract against them

16 because they are not in privity of contract with IKS-SC so their contract claims must be

17 dismissed as a matter of law.  Dkt. 123 at 30. Defendants implicitly argue that Enterprises

18 neither has ability to enforce the contracts of LGH in its own right because LGH had

19 repudiated its contract with the prior IKS entity, nor does Enterprises have status to sue as

20 a third-party beneficiary.  *See* Dkts. 123 at 30-31 and 137 at 6-7.  Additionally,

21 Defendants maintain they have no successor liability on any of the contracts made with

22 the prior IKS entity.  *See* Dkt. 137 at 3-6.

### 1.     Enterprises's Ability to Enforce LGH Contracts

As to Enterprises's ability enforce LGH contracts, Defendants argue that when Enterprises acquired the intangibles and assets of LGH (Dkt. 129 at 7 and n. 22), as an assignee Enterprises "took subject to defenses assertable against the assignor."  Dkt. 137 at 6 (*citing Lonsdale v. Chesterfield*, 99 Wn. 2d 353, 389 (1983)). Defendants argue that those defenses include repudiation, material breach, abandonment, waiver and estoppel. Dkt. 137 at 6.

It is undisputed that when LGH shut down its operations in June 2001 it owed approximately $100,000 in trade debt to the prior IKS entity, which LGH never paid.  In a June 25, 2001 letter, LGH notified IKS that it was terminating its business operations, that the bank had foreclosed on all its assets, that there will be nothing left for unsecured creditors, including IKS, and that foreclosure would likely result in LGH filing for Chapter 7 bankruptcy, which in fact occurred in January 2004.  Dkt. 27-4 at 34. Defendants argue that the notification of LGH's shut-down, and its failure to pay entitled IKS to treat LGH's conduct as "a discharge of any obligations that IKS Delaware owed to LGH" because LGH's acts constituted repudiation.  Dkt. 137 at 6-7.  Specifically, Defendants argue:

> "A repudiation is … a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such breach." Restatement (Second) of Contracts § 250(b) (1981). Repudiation "discharges any remaining obligations of performance of the other party with respect to the expected exchange." § 253 cmt. b (discharge).[ftnt omitted] "A breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." *Jacks v. Blazer*, 39 Wash. 2d 277, 285, 235 P.2d 187, 191 (1951). Therefore, IKS Delaware was entitled to treat LGH's

shutdown and non-payment in 2001 as a discharge of any obligations that IKS Delaware owed LGH. The prior breaches were not cured. No subsequent agreement expressly revived the prior contracts that had been discharged through repudiation or through expiration ….

*Id.*

It may appear on its face that LGH's shut-down of its operations and breach by failure to pay was a voluntary act that could constitute repudiation. However, the Defendants did not develop this legal argument regarding repudiation and discharge until they submitted their reply brief, leaving Enterprises without the opportunity to respond to what could be a somewhat complex or at least arguable legal issue. For example, it is unclear, because it has not been argued to the Court, whether LGH's foreclosure can legally constitute a voluntary act or whether LGH's resultant inability to pay IKS would constitute the same, such that LGH's conduct can be considered repudiation which discharges the prior IKS entity's duties under any contracts it had with LGH. Similarly unclear on the present briefing is the issue of whether contracts have been legally "revived" through subsequent contracts or conduct. Therefore, summary judgment is denied as to this issue.

## 2. Enterprise and Third-Party Beneficiary Status

In addition to asserting that Enterprises is not in contractual privity with the prior IKS entity based on LGH's contracts with IKS, Defendants argue that Enterprises is not a third-party beneficiary of LGH's contracts, purchase orders and form non-disclosure agreements. Dkt. 137 at 6. They maintain that Enterprises lacks this status because the

1  agreements reflect no intent that a fabricator "assume a direct obligation to" Enterprises.

2  *Id. (citing Kim Motiff,* 156 Wn. App. 689, 699 (2010).

3       Plaintiffs argue that there is at least a genuine issue of material fact regarding

4  whether Enterprises is a third-party beneficiary of LGH's contracts with prior IKS

5  entities, since LGH was a company owned by Haines & Emerson, which was a wholly-

6  owned subsidiary of Enterprises.  Dkt. 129 at 7-8.  Plaintiffs essentially maintain that the

7  deposition testimony of IKS employees demonstrates a genuine issue of material fact

8  exists, preventing summary judgment on Enterprises's right to sue for violation of LGH's

9  contracts. *Id.*  In particular, Enterprises argues that IKS employee Jeff Carr testified that

10 IKS manufactured knives for LGH and Ovalstrapping for use on Lamb equipment and

11 this testimony "suggests that IKS knew and intended that its agreements [with LGH] to

12 safeguard Lamb design drawings would benefit the licensor of those drawings."  *Id*. at 8.

13 Enterprises argues that Washington contract law precludes entry of summary judgment

14 without consideration of such extrinsic evidence of intent.  *Id*. at 8, n. 27.

15      A third-party beneficiary is one who, though not a party to the contract, will

16 nevertheless receive direct benefits therefrom. *Motiff*, 156 Wn. App. at 699 (*citing*

17 *McDonald Constr. Co. v. Murray,* 5 Wn. App. 68, 70 (1971), *review denied*, 79 Wn.2d

18 1009 (1971)).  In determining whether or not a third-party beneficiary status is created by

19 a contract, the critical question is whether the benefits flow directly from the contract or

20 whether they are merely incidental, indirect, or consequential.  *Id*.  An incidental

21 beneficiary acquires no right to recover damages for nonperformance of the contract.  *Id*.

22 It is not sufficient that the performance of the promise may benefit a third person but that

1   it must have been entered into for his benefit or at least such benefit must be the direct

2   result of performance and so within the contemplation of the parties. *Id.*

3   "The question whether a contract is made for the benefit of a third person is one of

4   construction. The intention of the parties in this respect is determined by the terms of the

5   contract as a whole construed in the light of the circumstances under which it was made."

6   *Id*. (*quoting McDonald*, 5 Wn. App. at 70 (internal quotation omitted)). The requisite

7   intent is not a desire or purpose to confer a benefit upon the third person nor a desire to

8   advance his interests but "an intent that the promisor shall assume a direct obligation to

9   him." *Id*. (*citing McDonald*, 5 Wn. App. at 70–71 (internal quotation omitted)).

10         Under terms of the purchase orders or the form non-disclosure agreements that a

11   prior IKS entered into or may have entered into with LGH, the Court finds that the record

12   does not reflect that the former IKS entity explicitly intended to assume any direct

13   obligation to Enterprises.  Additionally, based on a review of Jeff Carr's deposition

14   testimony, the Court finds that, contrary to Plaintiffs' argument, it does not create a

15   genuine issue of material fact as to whether he or other IKS employees knew that LGH,

16   Legacy or Ovalstrapping were licensees such that any contract IKS entered into with

17   either of them was for the benefit of a third-party licensor who owned the intellectual

18   property rights in the Lamb drawings.  Summary judgment is granted as to the third-party

19   beneficiary issue.

20        **3.**    **Contractual Claims Depend Largely on Successor Liability**

21         The contract claims in this suit against Defendants largely depend upon whether

22   Defendants have successor liability for contracts the prior IKS entity enters into with

1   Enterprises's wholly-owned subsidiaries, the now-defunct LGH, Legacy and

2   Ovalstrapping. Additionally, there are alleged contract claims between IKS-SC and

3   Ovalstrapping based on business conducted in late 2007 or early 2008.

4        As previously noted, on September 24, 2001, the prior IKS entity filed for Chapter

5   11 reorganization. Dkt. 19-1 at 31 (IKS Bankruptcy Docket).  On December 17, 2001, the

6   bankruptcy court issued an order confirming Second Amended Joint Plan of

7   Reorganization.  *Id*. at 45. On June 17, 2003, the final decree closing IKS's chapter 11

8   bankruptcy was issued.  *Id*. at 54.  On July 31, 2003, IKS's bankruptcy case was closed.

9   *Id*.  On October 31, 2003, the reorganized IKS merges with Simonds Industries, Inc.,

10  becoming one company, Simonds, which still exists today.  Dkt. 19-3 at 49.

11       Defendants maintain that "Enterprise has no evidence that Simonds voluntarily

12  assumed a pre-existing contract or entered into a new contract reaffirming any prior

13  agreements made by the prior IKS entity."  Dkt. 123 at 14.

14       Plaintiffs argue that IKS is not entitled to summary judgment in any respect,

15  including on the basis of successor liability. They argue that Defendants are "liable as a

16  successor to Simonds … and the earlier IKS entity."  Dkt. 129 at 8. Plaintiffs argue that

17  when two companies merge, the surviving company assumes the liabilities of both

18  companies. *Id*. at 9, n. 28 (*citing Minton v. Ralston Purina Co*., 146 Wn. 2d 385 (2002)

19  and RCW 23B.11.100(3)[2]).

20

21  _____

22       [2] RCW 23B.11.100(3) reads:

ORDER - 19

1  In Defendants' reply, they do not explicitly dispute the law with respect to merger

2  cited by Plaintiffs.  *See* Dkt. 137.  Instead, Defendants argue that "IKS-SC is not the

3  successor to Simonds and IKS Delaware" for other reasons.  *See id.* at 3-5.  Mainly,

4  Defendants argue they have no successor liability because IKS-SC did not assume the

5  liabilities or obligations associated with the Lamb drawings when IKS-SC and Simonds

6  entered into the 2006 asset acquisition agreement, which by its own terms must be

7  construed and enforced pursuant to Massachusetts law.  Dkt. 126-1 at 64.

8       **4.**     **Legal Standards for Successor Liability**

9  The doctrine of successor liability is equitable in both origin and nature. *Milliken*

10  *& Co. v. Duro Textiles, LLC*, 451 Mass. 547, 560 (2008) (*citing Ed Peters Jewelry Co. v.*

11  *C & J Jewelry Co.*, 215 F.3d 182, 186 (1st Cir. 2000)). "Equitable remedies are flexible

12  tools to be applied with the focus on fairness and justice."  *Id.* (*quoting Demoulas v.*

13  *Demoulas*, 428 Mass. 555, 580 (1998)).  Under principles of equity, a court will consider

14  a transaction according to its real nature, looking through its form to its substance and

15  intent. *Id.* (*citing See Henry F. Michell Co. v. Fitzgerald*, 353 Mass. 318, 321(1967)).

16  That is the essence of the imposition of principles of successor liability. *Id.*

17

18

---

19

20  When a merger of one or more corporations, one or more limited
   partnerships, one or more partnerships, or one or more limited liability companies
   takes effect, and a corporation is the surviving entity:

21                  \*\*\*

   (3) The surviving corporation has all the liabilities of each corporation,
22  limited partnership, partnership, and limited liability company party to the
   merger.

1    Massachusetts, like most jurisdictions, follows the traditional corporate law

2    principle that the liabilities of a selling predecessor corporation are not imposed upon the

3    successor corporation which purchases its assets, unless

4       "(1) the successor expressly or impliedly assumes liability of the
        predecessor, (2) the transaction is a de facto merger or consolidation, (3)
5       the successor is a mere continuation of the predecessor, or (4) the
        transaction is a fraudulent effort to avoid liabilities of the predecessor."

6

7    *Milliken & Co.,* 451 Mass. at 556 (*quoting Guzman v. MRM/Elgin*, 409 Mass. 563, 566

8    (1991)).  The public policy underlying the imposition of successor liability is the fair

9    remuneration of innocent corporate creditors.  *See Cargill, Inc. v. Beaver Coal & Oil Co*.,

10   424 Mass. 356, 362 (1997).

11       Plaintiffs do not argue liability based on assets that were transferred for fraudulent

12   purposes. Therefore, to the extent necessary, the Court focuses on the other possible

13   exceptions. However, before discussing exceptions, we first address Defendants'

14   argument that Plaintiffs have failed to plead successor liability.

15              **a.    Pleading Successor Liability**

16       Defendants argue that Plaintiffs failed to plead successor liability.  *See* Dkt. 123 at

17   20.  Additionally, Defendants maintain that even if Plaintiffs had pled successor liability,

18   that would be unavailing because "Plaintiffs' claims all concern Lamb drawing assets

19   acquired through IKS-SC's asset purchase agreement with Simonds International."[3]  *Id.*

20   _____

21       [3] In prior pleadings, Defendants appear to have indicated that IKS/ACM and IKS-SC were

22   separate entities between which no successor liability existed. Now, however, Defendants take a
     different position. As set forth in the fact section, Defendants assert that IKS/ACM, allegedly

1   at 31.  Defendants argue that, according to the traditional rule of law that "a corporation

2   purchasing the assets of another corporation does not become liable for the debts and

3   liabilities of the selling corporation," they are not liable as a successor corporation based

4   on the 2006 Asset Acquisition Agreement.  *Id.* (*quoting Bouchard v. CBS Corp.*, 2012

5   WL 6737529 (W.D. Wash. 2012) (*citing Martin v. Abbott Lab.*, 102 Wn.2d 581, 609

6   (1984)).

7        Plaintiffs have sufficiently pled facts alleging successor liability against

8   Defendants for the prior IKS entity's contractual obligations to LGH, Legacy and

9   Ovalstrapping.  *See* Dkt. 70 (Amended Complaint).  Plaintiffs maintain that whether the

10   2006 asset purchase "from Simonds to IKS caused IKS to succeed to Simonds' liabilities

11   on the contracts between IKS/Simonds and LGH, Legacy, and Oval" is at least question

12   of fact.  Dkt. 129 at 9.

13

14

---

15   formed through the June 30, 2006 Asset Acquisition Agreement, and the present IKS-SC entity
was apparently formed as a result of a January 7, 2008 Security Purchase Agreement. *See* Dkt.

16   32 at 9. In this round of summary judgment pleadings, Defendants explicitly maintain that "IKS-
SC paid $5.5 million to Simonds for specific assets."  Dkt. 137 at 3 (*citing* Dkt. 126-1 at 23

17   (2006 Asset Acquisition Agreement)). Additionally, Defendants maintain that "Ovalstrapping
and IKS-SC entered into a non-disclosure agreement in July 2007." Dkt. 123 at 30, n. 7 (citation

18   omitted).  However, Defendants have previously stated that IKS-SC was not yet in existence in
July 2007. Dkt. 32 at 9.   Defendants now state that "the two transactions entered into between

19   IKS-SC and Ovalstrapping in late 2007/early 2008 … [had] sales total[ing] $2120 for the same
replacement part."  Dkt. 123 at 30, n. 7 (citation omitted).  As noted above, Defendants had

20   previously asserted it was the January 7, 2008 agreement that formed IKS-SC, thus making it
impossible for an entity not yet in existence (IKS-SC) to be contracting with Simonds in 2006

21   and Ovalstrapping in 2007.  Yet Defendants' statements in the pleadings on the instant motion
make it clear to the Court that Defendants no longer dispute that IKS-SC and IKS/ACM are not

22   separate entities or at least that IKS-SC has successor liability to IKS/ACM for the purposes of
this suit.

1    Thus, the Court's analysis focuses on whether there is a genuine issue of material

2    fact that Defendants are liable under an exception to the traditional rule that there is no

3    successor liability in an asset purchase.

4              **b.      Express or Implied Assumption**

5    Plaintiffs maintain that the present IKS entity expressly or impliedly assumed the

6    liabilities on contracts Simonds made after its merger with reorganized IKS through

7    IKS/ACM and Simonds's 2006 Asset Acquisition Agreement. Dkt. 129 at 9. According

8    to Plaintiffs, the assets transferred to the present IKS entity expressly included "'All of

9    the Seller's files, books and records, invoices, ledgers, *product blue prints and*

10   *drawings*.'" *Id.* (*citing* Dkt. 19-3 at 60, Swanson Decl., Ex. J, Section 1.2.4 of Asset

11   Acquisition Agreement (emphasis added)). Plaintiffs argue:

12           By accepting possession of Lamb drawings held by Simonds for the
             limited purpose of supplying knives to EII's subsidiaries, reaffirming the
13           limitations on the drawings' use, and then continuing to use those drawings
             to supply knives to Oval, IKS impliedly assumed Simonds's liabilities in
14           connection with those drawings. In addition, the fact that IKS did not
             change brand name, locale, management personnel, or phone numbers
15           suggests IKS assumed all ordinary obligations necessary to continue
             normal business operations, such as personnel, utilities, taxes, etc.

16

17   Dkt. 129 at 9-10.

18   Defendants maintain that Plaintiffs have failed to come forward with evidence to

19   support their claim of successor liability. Dkt. 137 at 3. Defendants argue:

20           When IKS-SC purchased assets from Simonds, IKS-SC did not expressly
             assume any contract that either Simonds or IKS Delaware had with LGH or
21           Ovalstrapping. Enterprises argues that when IKS-SC purchased from
             Simonds "All of Seller's files, books, records, invoices, ledgers, product
22           blue prints and drawings," IKS-SC "impliedly assumed Simonds' liabilities

in connection with those drawings." Dkt. 129 at 9. But Enterprises failed to identify any contract provision where IKS-SC "impliedly assumed Simonds' liabilities in connection with those drawings."[*See id.*] "[A]n agreement is not implied from the mere fact a new corporation has voluntarily paid some of the debts of the old corporation, without further manifestation of an intent to pay all of its debts."

Dkt. 137 at 4, n. 2 (*quoting Uni-Com NW, Ltd. v. Argus Publishing Co.*, 47 Wn. App. 787, 801 (1987)).

Similar to the first round of summary judgment pleadings on this issue, the parties give the Court very little in the way of legal analysis for either of their respective positions.  Plaintiffs do little more than cite the legal principle that express or implied assumption is an exception. Defendants supply a useful case (*see supra*), which although it does not appear factually analogous to the present one, provides the Court with a way to analyze the assumption exception and appears consistent with the general framework for express or implied assumption under Massachusetts law.[4]

As Defendants note, according to *Uni-Com,* "an agreement is not implied from the mere fact a new corporation has voluntarily paid some of the debts of the old corporation, without further manifestation of an intent to pay all of its debts." 47 Wn. App. at 801. Again, while the case is not directly on point in terms of its subject matter, *Uni-Com*

---

[4] "[A] succeeding corporation is liable on the contracts or obligations of its predecessor where it either assumes them under express agreement or where the facts and circumstances are such as to show an assumption." *Aldrich v. ADD Inc.,*  437 Mass. 213, 218 (2002) (*citing Araserv, Inc. v. Bay State Harness Horse Racing & Breeding Ass'n, Inc.*,  437 F.Supp. 1083, 1089 (D.Mass.1977); *Pittsfield Gen. Hosp. v. Markus*, 355 Mass. 519, 521 (1969) and cases cited therein).

1    provides a legal framework for determining if assumption, especially implied assumption,

2    exists:

> [I]n order that a promise may be implied, on the part of a corporation, to pay the
> debts of another corporation, to the property and franchises of which it has
> succeeded by a valid purchase, the conduct or representations relied upon must
> show such an intention. The presence of such an intention depends on the facts
> and circumstances of each case. One of the factors to be considered is the effect of
> the transfer upon creditors of the predecessor corporation. Admissions of liability
> on the part of officers or other spokesmen of the successor corporation are also
> considered in determining whether implied liability exists. However, the mere fact
> that the new corporation has voluntarily paid some of the debts of the old
> corporation is no ground for inferring that it assumed the latter's debts ....

47 Wn. App. at 801 (*citing Long v. Home Health Serv. of Puget Sound, Inc.*, 43 Wn. App.

729, 734, *review denied*, 106 Wn.2d 1012 (1986) (*quoting* 15 W. Fletcher, Private

Corporations § 7124 (1983)).

    Based on the current record, it is undisputed that IKS-SC purchased "Specified

Assets," which expressly included "All of the [Simonds] files, books, and records,

invoices, ledgers, product blue prints and drawings...."  Dkt. 126-1 at 21 (Asset

Acquisition Agreement, 1.2.4.). It is also undisputed that the Lamb drawings would fall

into this category. Dkt. 123 at 14.  As Defendants note, IKS-SC did not expressly assume

any contracts regarding the drawings it acquired. They argue that

> Simonds warranted that it had good, valid and marketable title to the drawings,
> that no third party had any interest or rights in the assets, that Simonds "has
> unrestricted rights to use and dispose of any process, formulae and other know
> how necessary for Seller's present operations," that Simonds had not
> "misappropriated the trade secrets or other industrial property rights of any
> Person," and that no consents were required.

 Dkt.  123 at 14 (*citing* Asset Acquisition Agreement, §§ 1.2.4, 2.5, 3.3, 3.8, 3.13;

Schmidt Decl. Ex. C). The Plaintiffs have not pointed to any specific evidence in the

1  record indicating that the agreement expressly states that IKS-SC assumed the obligations

2  or liabilities to a third party associated with the acquired Lamb drawings.

3        Whether implied assumption exists is somewhat more difficult to determine.

4  When Simonds Industries merged with IKS, effective October 31, 2003, after IKS's

5  Chapter 11 reorganization, the newly formed corporation, Simonds, assumed all the debts

6  and liabilities of both contracting entities. *See supra*.  While Simonds is not a party,

7  Defendants point to no specific evidence in the record showing that, when IKS and

8  Simonds merged, Simonds was released from any obligations, liabilities or restrictions

9  associated with the acquired Lamb drawings.[5]  Therefore, to argue that IKS-SC, as the

10 purchasing entity from Simonds, is not subject to any obligations, liabilities printed on

11 acquired blue prints or drawings that Simonds had acquired or used to fabricate parts for

12 another entity seems at the very least inequitable. This is especially true based on IKS-

13 SC's corporate evolution and conduct after it acquired the Lamb drawings from Simonds.

14       Within six months of purchasing the Lamb-related assets , IKS-SC did business

15 with Ovalstrapping for the fabrication of Lamb parts. *See* Dkts. 126-2 at 116 (July 31,

16 2007 Non-Disclosure Agreement between Ovalstrapping and IKS-SC) 33-1 at 64-65

17 (IKS-SC's Acknowledge of order forms for Lamb parts dated December 14-15, 2007).

---

19       [5] Plaintiffs argue and the Court concurs that

20            [i]f IKS believes that Simonds misled IKS into believing that there was no
              limitation on Simonds' ability to use any of the thousands of drawings in
21            its possession, then IKS may have a claim against Simonds for
              misrepresentation.

22 Dkt. 129 at 11.

1   Before and throughout the merger period, as well as after the 2006 asset purchase from

2   Simonds, IKS and IKS-SC maintained the Lamb drawings and fabricated parts at the

3   same location, in Florence, South Carolina. *See, e.g.*, Dkts. 33-1 at 49-50 (April 2003 IKS

4   price quotations to Legacy for purchases of Lamb parts showing same address); 33-1 at

5   64-65 (December 2007 Acknowledgment of order forms for Ovalstrapping showing same

6   address); 19-3 (November 2003 IKS letter to customers regarding merger with Simonds,

7   indicating that "all purchase orders, pricing, shipments and other business processes

8   continue as normal" with all communications regarding customer service etc. … remain

9   unchanged); and 76-15 (June 2013 email from Dave Witman of Simonds to Plaintiffs'

10  counsel indicating "all manufacturing records, as well as all technical drawings related to

11  IKS Products, never left IKS at its Florence South Carolina facility, even during the

12  merger period"; that business was run by "former/current IKS personnel").  Additionally,

13  in 2006, Simonds sold the IKS business and all related manufacturing assets to senior

14  managers at the company.  *See* Dkt. 19-3. IKS managers included Jim Ranson, who

15  began with IKS in 1989, moved to Simonds in 2002, and back to IKS in 2006; and Terry

16  Isaacs and Mike Gray, who joined IKS in 1991, continued through to the Simonds merger

17  and asset sale and still work for the present IKS entity.  Dkt. 27-6 (Frush Decl., Ex. 20).

18  Isaacs is now IKS Executive Vice President and Gray is Vice President.  *Id*.  This

19  evidences intent by IKS-SC to continue the operations it had apparently been doing

20  before 2006, in its various prior corporate iterations.

21       Although there is nothing conclusive in the record, such as admissions by the

22  Defendants that they are liable for use of the Lamb drawings acquired from IKS-SC's

1    asset purchase from Simonds, one of the other factors in determining the applicability of

2    implied assumption is the obligations owed to third parties on the assets purchased. *See*

3    *Uni-Com*, 47 Wn. App. at 801 (consideration of the impact on creditors).  In this context,

4    the Court considers the impact of the owners or licensees of the intellectual property

5    rights in the Lamb drawings and any legal obligations attached to those drawings.  As a

6    result of asset purchase, IKS-SC could use the Lamb drawings however they wished, but

7    Plaintiffs would have no recourse for violation of the restrictions printed on the front of

8    the drawings and the contracts associated with the fabrication of Lamb knives or knife

9    blades, including purchase orders and non-disclosure agreements.

10          Given (1) Massachusetts' law regarding the flexible application of successor

11   liability, the express intent of which is to make determinations based on fairness and

12   equity by looking beyond form of transaction to its substance (*see supra*), (2) the inequity

13   to Plaintiffs noted above, and (3) IKS's history of operations and IKS-SC's conduct after

14   it entered into the purchase agreement with Simonds, the Court finds that IKS-SC

15   assumed the liabilities associated with any Lamb-related contracts connected to Lamb

16   drawings which Simonds gained as a result of the merger with IKS and entered into

17   during the merger period.  IKS-SC has successor liability for the prior IKS entities.

18   Summary judgment is denied as to this issue.

19          **5.    Existence of Contracts**

20          Defendants argue that Plaintiffs have not produced any contracts that they contend

21   were actually breached.  Dkt. 123 at 30. Defendants maintain that because "Enterprises

22   has failed to come forward with clear, cogent and convincing evidence of the substance

1  of any lost confidentiality agreement with the prior IKS entity or Simonds," Enterprises

2  cannot establish a breach of a confidentiality agreement against its alleged successor

3  defendants. *See id.*, n. 6 (*citing Braut v. Tarabochia*, 104 Wn. App. 728, 734 (2001)).

4      Plaintiffs argue that evidence in the record supports a finding of contracts between

5  the prior IKS entity and Enterprises's subsidiaries, in the form of Lamb drawings

6  associated with purchase orders, which contained non-use provisions. Dkt. 129 at 4.

7  Plaintiffs also argue that the evidence supports finding that a non-disclosure agreement

8  between LGH and IKS exists. According to Plaintiffs, this is so because (1) the record

9  contains evidence that it was LGH's business practice to require vendors to sign non-

10  disclosure forms, (2) examples of such forms in use during the same period in which

11  LGH contracted with the prior IKS entity are in the record, (3) documents of negotiations

12  between IKS and LGH have been submitted to the Court, and (4) testimony suggests that

13  IKS representatives signed non-disclosure agreements with LGH. Dkt. 129 at 4-5.

14      There is no dispute that the prior and current IKS entity did business with

15  Enterprises's subsidiaries.  There is also no question that that business involved IKS

16  fabrication of Lamb parts for those subsidiaries.  In short, the companies had a business

17  relationship for the fabrication of Lamb parts.  There is also no question that the prior

18  IKS entity was and IKS-SC is in possession of Lamb drawings, some or all of which

19  were acquired through IKS-SC or its predecessor's business dealings with Enterprises's

20  subsidiaries.

21

22

1          a.      **LGH**

2          Plaintiffs produced evidence that LGH "provided IKS with the drawings it needed

3   to fill LGH's purchase orders."  Dkt. 26 ¶ 21 (Lamb Decl).  Examples of LGH's purchase

4   orders are in the record, including one complete contract dated May 21, 2001 between

5   LGH and IKS (Dkt. 27-4 at 12-13) as well as the front page of another purchase order

6   between LGH and IKS.  Dkt. 27-4 at 2, 6 and 8.  Plaintiffs correctly state that the

7   purchase orders from LGH to IKS were sent on a few different forms. *See* Dkts. 27-4 at

8   2, 6, 8 and 27-4 at 12.  Nonetheless, the front pages of the forms, including the complete

9   purchase order between LGH and IKS, state that the orders are "SUBJECT

10  TO…CONDITIONS…ON THE REVERSE SIDE." *Id.*  A complete blank purchase

11  order form that LGH used is also in the record, and the relevant terms and conditions are

12  the same with respect to the IKS purchase order. *See* Dkts. 27-4 at 13 and 19.  The

13  purchase order conditions instructed IKS to sign and return the acknowledgement copy of

14  the purchase order, "which will constitute [IKS's] acceptance of all conditions herein."

15  *See* Dkts. 27-4 at 13 and 19.  The conditions accepted by IKS include: that drawings

16  furnished by LGH are "only to be used" to make parts for LGH and states: "Whenever

17  [IKS] ha[s] [LGH's] property in [IKS's] possession, by virtue of this order, [IKS] will be

18  considered an insurer of the property and will be responsible for its safe return to us." *See*

19  *id*.  Wilson, Ovalstrapping's 30(b)(6) deponent and a former purchasing agent for LGH,

20  has testified that drawings of the relevant knives were always sent to IKS in connection

21  with each purchase order.  Dkt. 130-4 at 6-7.  Given the foregoing, the Court finds that

22  sufficient evidence exists to find a genuine issue of material fact regarding the existence

1    of contracts in the form of purchase orders between LGH and IKS.  Summary judgment

2    is denied as to this issue.

3         Similarly, with respect to a non-disclosure agreement, the Court finds that

4    Plaintiffs have produced sufficient evidence that a non-disclosure agreement existed

5    between LHG and IKS. There is testimony in the record that LGH had a practice of

6    entering such agreements.  Dkt. 26 at 5 ¶ 22 (practice of Lamb companies was and is to

7    require vendors to execute a nondisclosure agreement prohibiting vendors from using

8    Enterprises's intellectual property for any reason other than to fill orders).  Additionally,

9    Wilson's testimony suggests IKS representatives entered into non-disclosure agreements

10   with LGH.  *See, e.g.,* Dkt. 130-3 at 2-3 (naming Jeff Carr and Terry Isaacs as signing

11   non-disclosure agreements on behalf of IKS).  Further, Plaintiffs have produced dozens

12   of other non-disclosure agreements that LGH entered into with other businesses during

13   the time period that LGH was doing business with IKS, although some or all of them

14   were not for knive or knife blade fabricators. Dkt. 130-1. Therefore, summary judgment

15   is also denied as to this issue.

16              **b.    Legacy**

17        Defendants observe that Legacy claims that it had a purchase order with the

18   prior IKS entity in June 2003 and that order included a requirement for written consent to

19   disclose trade secret, confidential or proprietary information. Dkt. 123 at 13. Defendants

20   argue that even assuming that the prior IKS entity received such a provision, there is no

21   evidence that Legacy furnished a drawing in conjunction with the order. *Id.*

22

1      Plaintiffs submitted a purchase order for Lamb products dated June 18, 2003. Dkt.

2  27-5 at 14.  Similar to LGH's purchase orders, on the front of Legacy's form, it indicates

3  that "Acceptance of this order, as evidenced by commencement of work, creates a

4  binding contract … according to the terms and conditions stipulated herein and in the

5  attached Purchase Order Terms and Conditions and no others."  *Id*.  Plaintiff also

6  submitted a "Legacy Automation Purchase Order Terms & Conditions" form that they

7  assert was attached to every Legacy purchase order; the terms and conditions are

8  explicitly referenced on the front of every purchase order.  Dkt. 27-5 at 17-18 (Wilson

9  Dep.).  Legacy's terms and conditions include both non-use and non-disclosure

10  provisions for all "specifications, data and other information furnished … in connection

11  with this order." *Id*. at 18.  The purchase order form contract clearly reflects a practice of

12  furnishing Lamb drawings in connection with the purchase orders.  Although there is no

13  testimony specifically related to whether Legacy furnished a drawing in connection with

14  each of its purchase orders, the previously mentioned testimony of David Lamb and

15  Wilson indicates that it was the practice of the Lamb companies to furnish drawings to

16  fabricators for the purposes of permitting them to fabricate the Lamb part. *See supra*.

17  The Court finds there is a genuine issue of material fact as to whether Legacy and the

18  prior IKS entity had contracts in the form of purchase orders which restricted IKS from

19  disclosing or using the Lamb drawings for any other purpose than to fabricate Lamb parts

20  for Legacy.  Summary judgment on this issue is denied.

21      As to separate non-disclosure agreements between Legacy and the prior IKS

22  entity, the Court finds there is not sufficient evidence in the record to create a genuine

1   issue of material fact that Legacy and the prior IKS entity had such an agreement. Legacy

2   has submitted several non-disclosure agreements between it and several other vendors.

3   Some of those were entered into during the time frame Legacy did business with the prior

4   IKS entity but none were with the prior IKS entity. More importantly, as Defendants'

5   observe, in response to Defendants' Requests for Admission Nos. 6-8, Legacy states that

6   it never entered into a written contractual agreement (a non-disclosure agreement is a

7   written contract), written licensing agreement or oral licensing agreement with a former

8   IKS entity, though IKS did so with a Legacy predecessor. *See* Dkt. 33-1 at 8-9.  On this

9   record, the Court finds that no genuine issue of material fact exists as to whether Legacy

10  itself has an enforceable non-disclosure agreement with Defendants.  Summary judgment

11  is granted as to this issue.

12      To the extent Legacy is a successor in interest to contractual rights between a prior

13  Enterprises's subsidiary and the prior IKS entity, Legacy can sue to enforce contracts of

14  that subsidiary, although, practically speaking, Legacy would really just be suing to

15  enforce contracts relating to the intellectual property of Enterprises, which Enterprises

16  itself is already doing in this suit.

17          **c.    Ovalstrapping**

18      While the Court is unable to find any complete purchase order form with terms

19  and conditions attached to it between Ovalstrapping and Simonds, Defendants admit that

20  Ovalstrapping and Simonds entered into purchase orders in 2005 and 2006. Dkt. 123 at

21  14 (*citing* Dkt. 32 at 8-9). The record reflects formal business dealings between

22  Ovalstrapping and Simonds for the period of 2004-2006 (Dkt. 116-3 at 23-74) in the form

1   of invoices and packing lists, which explicitly reference different Ovalstrapping purchase

2   orders, as well as checks written from Ovalstrapping to Simonds.  *See, e.g.*, Dkt. 116-3 at

3   23- 24 (February 2004 invoice and packing list referring to purchase order c6114).  These

4   documents indicate that purchase order forms were connected with Ovalstrapping orders

5   sent to Simonds, even before 2005. As noted above, Wilson, Ovalstrapping's 30(b)(6)

6   deponent, has testified that drawings of the relevant knives were always sent in

7   connection with each purchase order. Dkt. 130-4 at 6-7. In the record, Plaintiffs provide

8   the "terms and conditions page that accompanies Ovalstrapping purchase orders." Dkts.

9   27 at 4 (Frush Decl. ¶ 20) and 27-5 at 23 (Ovalstrapping's terms and conditions page).

10  Ovalstrapping's terms and conditions page, similar to LGH's and Legacy's, contains a

11  provision prohibiting disclosure of Lamb drawings as well as the use of them for any

12  other purpose than specified by Ovalstrapping.  Dkt. 25-5 at 23.  Sufficient evidence

13  exists to create a genuine issue of material fact that Ovalstrapping entered into contracts,

14  in the form of a purchase order, with Simonds. Summary judgment as to this issue is

15  denied.

16          While there are purchase order forms in the record, there is no non-disclosure

17  agreement between Ovalstrapping and Simonds. Ovalstrapping looked for, but could not

18  locate one. Dkt. 116-2 at 22 (Wilson Dep.).  However, after IKS-SC purchased all the

19  Lamb-related assets from Simonds and began to do business solely under the name IKS-

20  SC, it signed a July 6, 2007 non-disclosure agreement with Ovalstrapping.  Dkt. 126-2 at

21  116.  Similar to most of the non-disclosure agreements entered into by LGH and Legacy,

22  Ovalstrapping's agreement with IKS-SC contains a confidentiality provision requiring

1    that IKS-SC not disclose the Lamb drawings, copy them, otherwise reveal or allow others

2    to view them for any other purposes than specified by Ovalstrapping.  *See id.*  Further,

3    the record includes acknowledgment of order forms, dated December 14-15, 2007, from

4    IKS-SC to Ovalstrapping for Lamb parts. Dkt. 33-1 at 64-65.

5         Defendants argue that Plaintiffs have produced no technical drawings that were

6    actually sent from Ovalstrapping to IKS-SC and that their non-disclosure agreement only

7    indicates that Ovalstrapping "might" send a drawing. Dkt. 123 at 30, n. 7.  Additionally,

8    Defendants argue IKS-SC's business dealings with Ovalstrapping were limited to

9    replacement parts based on one Lamb drawing prepared by the prior IKS entity on

10   January 12, 2000. *Id.* (*citing* Dkt. 106). Therefore, Defendants argue that the drawing on

11   which the replacement parts were based predates the much later IKS-SC non-disclosure

12   agreement with Ovalstrapping.  *Id.*

13        The Court has already determined that IKS-SC has successor liability.  If IKS-SC

14   used a Lamb drawing that pre-dates its July 2007 non-disclosure agreement with

15   Ovalstrapping for purposes other than specified in prior terms and conditions attached to

16   purchase orders or in contravention of a non-disclosure agreement, those are issues, along

17   with the existence of such contracts, to be decided by the trier of fact.  *See supra.*

18   Therefore, on the foregoing bases, the Court denies summary judgment.

19        **6.     Quantum Meruit Claim and Copyright Preemption**

20        The Copyright Act specifically preempts "all legal or equitable rights that

21   are equivalent to any of the exclusive rights within the general scope of copyright." 17

22   U.S.C. § 301(a); *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005).

1    The intention of Section 301 of the Copyright Act is to preempt and abolish any rights

2    under the common law or statutes of a state that are equivalent to copyright and that

3    extend to works within the scope of the federal copyright law.  *Laws v. Sony Music*

4    *Entertainment, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006).  The rights protected under the

5    Copyright Act include the rights of reproduction, preparation of derivative works,

6    distribution, and display. 17 U.S.C. § 106; *Laws*, 448 F.3d at 1137; *Altera Corp*., 424

7    F.3d at 1089.  Copyright is the right to control the work, including the decision to make

8    the work available to or withhold it from the public.  *Laws*, 448 F.3d at 1137.

9         The Ninth Circuit has adopted a two-part test to determine whether a state law

10   claim is preempted by the Copyright Act.  First, the work at issue must come within the

11   subject matter of copyright. Second, the state law rights must be equivalent to the

12   exclusive rights of copyright.  *Laws*, 448 F.3d at 1137–38; *Grosso v. Miramax Film*

13   *Corp*., 383 F.3d 965, 968 (9th Cir. 2004).  To survive preemption, the state law claim

14   must include an "extra element" that makes the right asserted qualitatively different from

15   those protected under the Copyright Act.  *Altera Corp*., 424 F.3d at 1089. Whether

16   copyright preemption applies is a question of law.  *Id.*

17        Although Enterprises's claim for copyright infringement based on three of their

18   drawings have been dismissed, claims for infringement still remain in the case for the

19   reasons stated above.  *See supra.*  Therefore, the Court will address Defendants'

20

21

22

1   argument that Plaintiffs' copyright claims preempt their implied-in-fact contract or

2   quantum meruit claim.  Dkt. 137 at 11-12.[6]

3       Defendants maintain that the quantum meruit claim is preempted by Plaintiffs'

4   copyright claim because the quantum meruit claim does not contain the "extra element"

5   which transforms the action into one independent of the Copyright Act.  Dkt. 137 at 11

6   (*citing Worth v. Univ. Picture, Inc.*, 5 F. Supp. 2d 816, 822 (1997)).  Defendants argue

7   that the "nearly unanimous rule that quantum merit or implied contract claims lack this

8   'extra element,'" and "[c]ourts interpret these claims as involving equivalent rights to

9   copyrights and [are] thus pre-empted."  Dkt. 137 at 12 (*citing Nimmer*, § 1.01[B][1][g]).

10      Plaintiffs argue that their claims for implied breach of contract are not pre-empted

11  by the Copyright Act.  Dkt. 129 at 12-13.  Plaintiffs do not specifically discuss their

12  quantum meruit claim, implied-in-fact contract, as distinguished from their unjust

13  enrichment claim, implied-in-law contract.  *See id.*  Rather, Plaintiffs argue that their

14  implied contract claims have the requisite "extra element," which "is the implied promise

15  by IKS that if plaintiffs would provide it with a drawing or drawings, it would not only

16  limit its use of the drawing(s) but also provide plaintiffs with knives." *Id*. (*citing

17  Northwest Home Designing Inc. v. Sound Built Homes, Inc*, 776 F. Supp. 1210 (2011)).

18      Plaintiffs' quantum meruit claim is not qualitatively different from its copyright

19  infringement claim.  Plaintiffs argue that the "extra element" is satisfied because there is

20  an implied promise both not to use Plaintiffs' drawings for other purposes than what they

21  _____

22      [6] For the purposes of summary judgment, Defendants' reply brief explicitly narrows their
    copyright preemption argument to Plaintiffs' quantum merit claim.

ORDER - 37

1  have specified and to "provide plaintiffs with knives." *See supra*.  The problem with

2  Plaintiffs' argument is that the basis of their quantum meriut claim is not that Defendants

3  breached an implied contract by failing to supply them knives for which they should have

4  been paid.  *See* Dkt. 70 (Amended Complaint).  Rather, Plaintiffs' quantum meruit claim

5  is based on Defendants' use or disclosure of the Lamb drawings for purposes other than

6  specified by Plaintiffs. *See id*.  Thus, Plaintiffs' quantum meruit claim falls within the

7  rights protected under the Copyright Act, which include the rights of reproduction,

8  preparation of derivative works, distribution, display as well as right to control the work,

9  including the decision to make the work available or withhold it from the public. 17

10  U.S.C. § 106; *Laws*, 448 F.3d at 1137.  Therefore, as long as Plaintiffs' copyright claims

11  remain in the case, they preempt Plaintiffs' quantum meruit claim.  Summary judgment is

12  granted as to this issue.

### IV. ORDER

14      Therefore, it is hereby **ORDERED** that Defendants' motion for summary

15  judgment is **GRANTED in part** and **DENIED in part** as set forth herein.

16      Dated this 24th day of July, 2014.

BENJAMIN H. SETTLE
United States District Judge